**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KENNETH HANTMAN, INC.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE WHITING-TURNER** | : | |
| **CONTRACTING COMPANY,** | : | **No. 07-1574** |
| **Defendant.** | : | |

<u>**MEMORANDUM & ORDER**</u>

**Schiller, J.**                                                                                   **September 2, 2008**

Plaintiff Kenneth Hantman, Inc. ( "Kenneth Hantman") brings the current action against the

Whiting-Turner Contracting Company ("Whiting-Turner") for breach of contract, breach of the

implied duty of good faith and fair dealing, and intentional misrepresentation.  Defendant also brings

a counterclaim against Plaintiff for breach of contract.

Plaintiff, a subcontractor, performed fence installation services on a project for the Navy, on

which Defendant was the contractor.  During the course of that project, Plaintiff's workers

encountered problems with one of the Naval Inspectors.  After the project was complete, Plaintiff

attempted to bring a claim against the Navy to recover for the Inspector's interference.  However,

as the contractor on the project, Defendant had to "sponsor" Plaintiff's claims before the Department

of the Navy's dispute resolution body.  Plaintiff alleges that Whiting-Turner unilaterally withdrew

those claims mid-process.  Plaintiff now brings suit against Whiting-Turner to recover what it

believes should have been recouped from the Navy.

Defendant responds, *inter alia*, that Plaintiff's claims against the Navy were barred by

contractual releases that Plaintiff signed, waiving its right to bring future claims against the Navy

based on events occurring during the fence-installation project.  In turn, argues Defendant, Plaintiff

cannot now bring a claim for recovery against Whiting-Turner for what it could not have recovered against the Navy.  For the reasons discussed below, the Court agrees with Defendant and finds that Plaintiff's claims fail.  However, Defendant's counterclaim for attorneys' fees also fails.

A bench trial was held on June 17, 2008.  The Court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## I.    FINDINGS OF FACT

### A.    Background

Defendant is a general contractor involved in various lines of construction.  (*See* Parties' Joint Pre-trial Stipulation Agreed Facts [hereinafter Agreed Facts] ¶ 1.)  On August 11, 2003, Defendant entered into a subcontract with Plaintiff, a fencing corporation, for fence installations services in Philadelphia, on a project for and owned by the United States Navy.  (*Id.* ¶¶ 2-3; Pl.'s Ex. 2 [hereinafter Subcontract].)  The project was known as "Perimeter Security Fence System Naval Support Activity."  (*Id.* ¶ 4.)

### B.    Terms of the Subcontract: Releases and Claims for Additional Time

#### 1.    Releases

The Subcontract included Partial Release and Final Release forms.  (*See* Subcontract Article 1 & Article 11; Def.'s Ex. 2 [hereinafter Supplemental Conditions] Section V (Partial Release) & Section VI (Final Release); *see also* Subcontract Article 8(b) ("Subcontractor agrees to execute such

---

[1] Pursuant to Local Rule of Civil Procedure 53.2, this case was submitted to arbitration and an award was entered on April 24, 2008.  Plaintiff timely requested a trial de novo.  As required by Rule 53.2(7)(C), this Court did not allow evidence of the arbitration proceedings at trial nor did it consider the occurrence or results of those proceedings in rendering this Opinion.

specific releases and/or waiver of liens and lien rights as may be requested by the contractor.")  The

Partial Releases, which were limited in time, would be "completed each month and submitted to

Whiting-Turner prior to the release of the Trade Contractor's [Kenneth Hantman] Payment."

(Supplemental Conditions II (Invoice Forms and Requirements).)  The Partial Release states in

relevant part:

> The undersigned Contractor [Kenneth Hantman, Inc.], in
> consideration of payments previously made and payment for the
> period covered by the current invoice as set forth above, hereby
> waives and releases . . . all claims and demands against Construction
> Manager [Whiting-Turner], [and] Owner [the Department of the
> Navy] . . . in any manner arising out of work, labor, services,
> equipment or materials performed or furnished by Contractor, its
> subcontractors and suppliers, in connection with the Project . . .
> through the period covered by the current invoice and all previous
> invoices.

(Supplemental Conditions V (Partial Release of Lien Form) Preamble).  The Partial Release form

additionally required Plaintiff to affirm that it was "aware of no claims or any circumstances that

could give rise to any future claims against Construction Manager [or] Owner." (*Id.* ¶ 4.)   If there

was a "claim or circumstance," Plaintiff was provided blank space to describe any such situation.

(*Id.*)

In addition to the Partial Release, the Subcontract contained a Final Release, "to be

completed and submitted to Whiting-Turner prior to the release of the Trade Contractor's final

payment." (Supplemental Conditions II.)  Pursuant to that form and "in consideration of final

payment" Plaintiff was to agree to:

> save harmless[] the Whiting-Turner Contracting Company and the
> above [the Department of the Navy] . . . from all causes of action,
> suits, debts, contracts, damages, [and] judgments . . . including
> attorneys' fees, in law, equity or otherwise, which Trade Contractor

3

> [or others] . . . ever had, now have or hereafter may have against the
> Whiting-Turner Contracting Company or the above Owner . . . from
> the beginning of the world to the date of this Release, in any manner
> relating to or arising in connection with the above referenced contract
> or project.

In order to "Close Out" the project, Plaintiff had to sign the Final Release.  (Supplemental Conditions III (Project Close Out).)

Over the course of the project Mr. Hantman signed all of the Partial Releases, without ever listing a "claim or circumstance" that could give rise to a future claim against Whiting-Turner pr the Navy; additionally, he signed the Final Release.  (*See* Pl.'s Ex. 32.)  All of the forms signed were identical to the blank forms indexed in the Subcontract.  (*Compare* Pl.'s Ex. 32 *with* Def.'s Ex. 2.) Plaintiff received payment in full.  (Pl.'s Ex. 33; Tr. at 88-92, 94-95.)

> 2.    *Claims for Additional Time or Compensation*

Article 6(d) of the Subcontract provided the following mechanism for resolving any problems that Kenneth Hantman encountered during the course of the project, or for requesting additional time or compensation associated with delays on the project:

> In the event of any dispute, controversy, or claim for additional
> compensation or time extensions, notice in writing shall be given to
> the Contractor no later than seven (7) days following the occurrence
> on which claim based. . . . Any claim not presented within such time
> period shall be deemed waived by he Subcontractor.  Promptly
> thereafter, Subcontractor shall provide detailed information to
> substantiate such claim including supporting documentation and
> calculations and including any information requested by Contractor.

(Subcontract Article 6(d).)

### C.    Naval Inspector Fitzgerald

Over the course of the project, Mr. Kenneth Hantman, who shares his moniker with the

company of which he is President, was involved in skirmishes with and received a number of complaints concerning Naval Inspector Charlie Fitzgerald. (*See* Pl.'s Exs. 3 (Dec. 9, 2003 Letter) & Ex. 4 (Mar. 25, 2004 Letter) & Ex. 5 (Mar. 29, 2004 Letter); June 17, 2008 Tr. at 16.) Mr. Hantman recalled at least one instance where Inspector Fitzgerald verbally assaulted him.[2] (Tr. at 12-13; Pl.'s Ex. 3.) In another incident, Inspector Fitzgerald removed his crew in the middle of a project, leaving Mr. Hantman alone to perform a three-person job. (*Id.* at 18.) Additionally, a number of Plaintiff's workers and subcontractors reported to Mr. Hantman that they were having problems with Inspector Fitzgerald – he was yelling at them or grabbing them while they worked. (*See*, *e.g.*, *Id.* at 73-74, 79; Pl.'s Exs 3, 4, 5. ) Finally, Mr. Hantman also believed that Inspector Fitzgerald falsely reported to the Department of Labor that Plaintiff and/or his subcontractor was engaged in unlawful activities, a claim of which Plaintiff was later vindicated.[3] (Tr. at 22-23.)

    In response to these reports of Fitzgerald's behavior, Mr. Hantman sent three letters to Whiting-Turner, dated December 9, 2003, March 25, 2004 and March 29, 2004, reporting Inspector Fitzgerald's misconduct and seeking his removal from the project (Agreed facts ¶ 7; Pl.'s Exs. 3, 4, and 5.) The letters did not describe increased costs or delays on the project. On March 29, 2004, Whiting-Turner forwarded Mr. Hantman's letters on to the Navy – Fitzgerald's employer. (Agreed

---

[2] Mr. Hantman testified, regarding this experience, that he was particularly upset because Inspector Fitzgerald "tendered no apology to me. And I was burned up and really – it's a very, sort of, brutal experience." (*Id.* at 13.)

[3] Mr. Hantman admits that Inspector Fitzgerald may have received faulty information that one of Plaintiff's subcontractors was not reporting income; according to Mr. Hantman, however, there was no veracity to any such statement.
    In a letter dated July 21, 2004, directed to the Department of Labor, Hantman describes Inspector Fitzgerald as "mentally unbalanced," or having an "illegitimate reason[] to simulate mental imbalance." (Pl.'s Ex. 10 (July 21, 2004 Letter).)

Facts ¶ 8; Pl.'s Ex. 8 Mar. 29, 2004 Cinamella Letter).)  On September 19, 2004, also by way of letter, the Navy informed Whiting-Turner, who in turn informed Mr. Hantman, that they had conducted an inquiry regarding his complaints and, to the extent that they had determined that Inspector Fitzgerald was engaged in misconduct, they had pursued a course of administrative action. (Pl.'s Ex. 11 (Sept. 19, 2004 Letter); Tr. at 25-26; *see also* Def.'s Ex. 4 (Incident Report).)  Mr. Hantman was interviewed as part of the investigation.  (Tr. at 124.)

While the project was scheduled to take less than three months, Plaintiff took six months to complete the job.  Mr. Hantman did not report any delays to the project associated with Inspector Fitzgerald's conduct.  In response to inquiries by Defendant as to why Plaintiff had fallen behind schedule on the project, Plaintiff wrote two letters, which both laid out numerous  reasons for the delays they were experiencing.  Aside from a passing comment – "I did have some adversity of which you are aware" – none of the enumerated reasons included Inspector Fitzgerald's conduct. (Def.'s Ex. 7 (Dec. 26, 2003 Letter); Pl.'s Ex. 9 (April 29, 2004 Letter).)  Additionally, Plaintiff did not submit a claim for additional time or compensation, resulting from the alleged acts of Inspector Fitzgerald, in accordance with Article 6(d), discussed *supra*.

### D.    Plaintiff's Claim Against the Navy

Despite the fact that Plaintiff never earlier reported any alleged delays caused by Inspector Fitzgerald's misconduct, fifteen months after the project was complete, it decided to submit a claim against the Navy to the Department of the Navy's dispute resolution body.

In order to submit such a claim, Plaintiff first had to ask Whiting-Turner, as the general contractor on the project, to "sponsor" Plaintiff's claims.  (*See* Subcontract Article 6(e).)  On this issue, the Subcontract makes clear that, by sponsoring Plaintiff's claims against the Navy, Whiting-

6

Turner would not be "acknowledg[ing] of the validity" of the claims or "waiv[ing] any right[s]." (*Id.*)

On February 23, 2006, Plaintiff initiated this process. Mr. Hantman wrote a letter to Charles Cinamella at Whiting-Turner, stating that Plaintiff sought to submit a claim against the Navy for $98,847.77 for interference caused by Inspector Fitzgerald. (*Id.*) It requested Defendant's sponsorship, but emphasized that Whiting-Turner need not take a position on the merits of the claim, nor endorse the claim in any way: "In essence, you forward the claim without comments and step aside." (*Id.*) Further, the letter reassured Whiting-Turner that Plaintiff would pay all of the costs associated with the claim, and that Plaintiff would not seek recovery against Whiting-Turner arising from the Fitzgerald incidents.[4] (*Id.*)

On March 23, 2006, Charles Cinamella responded: "As requested, Whiting-Turner has forwarded your February 23, 2007 claim to the Department of the Navy . . . Further, as stated in your February 23, 2006 letter, Kenneth S. Hantman, Inc. will bear all of its own legal costs and agrees not to seek any type of recovery from Whiting-Turner." (Pl.'s Ex. 15 (Mar. 23, 2006 Letter).) In his letter to the Navy regarding the same, Cinamella stated that "Whiting-Turner is simply forwarding this as the prime contractor and requests that any decisions or correspondence be communicated directly with Kenneth S. Hantman, Inc." (Pl.'s Ex. 16 (Mar. 23, 2006 Letter to Navy).)

The Navy's dispute resolution body failed to act on Plaintiff's claim within sixty days. (Agreed Facts ¶ 12.) Accordingly, on July 19, 2006, Plaintiff, acting *pro se*, filed a "Notice of Appeal of Deemed Denial" with the Naval Board of Contract Appeals. (Pl.'s Ex. 17 (July 19, 2006 Letter).)

---

[4] Mr. Hantman also offered to "box" Mr. Fitzgerald as an alternative means to resolve their dispute. (Tr. at 142-43; Pl.'s Ex. 22 (Nov. 1, 2006 Email).)

While on appeal, the issue of the Partial and Final Releases came to the forefront.  In October 2006, Catherine Stanton, Recorder for the Board of Contract Appeals, wrote to the parties that "A review of the . . . file suggests that [Hantman] may have filed the claim after receipt of final payment, which would preclude recovery at the Board."  (Pl.'s Ex. 19 (Oct. 13, 2006 Letter).)  In other words, Plaintiff was required to file its claims against the Navy prior to signing the Final Release and settling his accounts.  Further, Defendant's sponsorship of Plaintiff's claim became an issue.  Ms. Stanton additionally wrote to the parties: "Unless and until a corporate officer of Whiting-Turner Contracting Company expressly authorizes Mr. Hantman to be a representative . . . Mr. Hantman may not continue with the adjudication of the appeal."  (Pl.'s Ex. 20 (Oct. 25, 2006 Letter).)

Upon receiving word that they would have to appoint Plaintiff formally as its representative, Whiting-Turner presented Plaintiff with a Liquidation Agreement.  (Pl.'s Ex. 23 (Nov. 18, 2006 Letter & Marked-Up Liquidating Agreement); Tr. at 141.)  Pursuant to the terms of the Liquidating Agreement, in return for Whiting-Turner's authorization of Kenneth Hantman as its representative, Mr. Hantman was to attest that all of the claims before the Board of Contract Appeals were made in good faith.  The Liquidating Agreement also reiterated that all of the risks and benefits of the claims belonged to Plaintiff.  (*See* Pl.'s Ex. 23.)

Although the parties agreed generally on the terms of the Liquidating Agreement, there was one sticking point.  Plaintiff sought to add a term requiring that Charles Cinamella, Whiting-Turner's Project Manager who was present when Mr. Hantman signed the Final Release, execute an affidavit that was "acceptable to [Kenneth Hantman]."  Mr. Hantman, who was preparing to argue before the Board of Contract Appeals that the Releases were not a bar to his recovery, wanted Mr. Cinemella to state that he also did not believe that Plaintiff's claims were barred by the Releases.  (*See* Pl.'s Ex.

27 (Dec. 11, 2006 Email) at 1.)  Although Defendant was willing to supply Cinamella's affidavit,

it refused to acquire Plaintiff's approval prior to execution and generally did not agree with the

language of Plaintiff's proposed affidavit.  (*See* Pl.'s Ex. 23 (Proposed Liquidating Agreement) ¶

1(e) & Ex. 24 (Response to Marked-Up Liquidating Agreement) ¶ 1(e); Def.'s Ex. 27 (Dec. 14, 2006

8:27 Email) & 28 (Dec. 14, 2006 5:24 Email).)

Whiting-Turner wrote to the Board of Contract Appeals on December 4, 2006 that they were

authorizing Plaintiff to act as their representative in the aforementioned proceedings.  (Pl.'s Ex. 25

(Dec. 4, 2006 Letter.)  Nonetheless, when the parties could not agree on the terms of the Cinamella

affidavit, Plaintiff withdrew its claims before the Board of Contract Appeals.[5]  (Pl.'s Exs. 28 (Dec.

19, 2006 Hantman Withdrawal Letter) &   29 (Dec. 19, 2006 DeSilva Withdrawal Letter).)

Furthermore, despite the fact that Plaintiff had three weeks to reinstate its claims, it pursued no such

course of conduct.  (Tr. at 191; Pl.'s Ex. 31 (Dec. 26, 2006 Letter).)  Rather, Plaintiff filed suit

against Defendant in Pennsylvania state court, an action which was subsequently removed here.

---

[5] The parties dispute whose decision it was to withdrew the claim.  Plaintiff testified that he was told by Whiting-Turner's corporate counsel, Dan China, that Defendant was withdrawing its sponsorship of Defendant's claims and, therefore, they would have to be withdrawn.  (Tr. at 47, 121, 135.)  Nonetheless, Mr. Hantman's testimony is contrary to the weight of the evidence. In an email dated December 14, 2006, Plaintiff wrote that, if the parties could not agree to the terms of Cinamella's Affidavit, "[t]he alternative here is *for me to suggest* that Whiting-Turner withdraw its appeals since we have failed to have reached the conditions to execute the liquidating agreement."  (Pl.'s Ex. 27 at 5 (emphasis added).)  Mr. Hantman went on to threaten to sue Whiting-Turner in court.  (*Id.*)  Mr. Hantman made the same statements in a separate email.  (*See* Def.'s Ex. 28 (Dec. 14, 2006, 3:41 Email) (If you cannot sign the affidavit "you should notify the Board that you are withdrawing the claim and I will perforce file a claim in Maryland.").)  Furthermore, Mr. China testified that it was Mr. Hantman who suggested that the claims be withdrawn.  (Tr. at 155, 157.)

Accordingly, it was only after the parties could not agree on an affidavit and at Hantman's directive that Plaintiff's claims before the Board of Contract Appeals were withdrawn.  On this issue, based on the evidence received during the trial and Mr. Hantman's demeanor and testimony from the witness stand, the Court discredits Mr. Hantman's testimony.

## II.     CONCLUSIONS OF LAW

Plaintiff brings four claims against Defendant: (1) breach of contract; (2) breach of the implied duty of good faith and fair dealing, for withdrawing Plaintiff's claim from the Board of Navy Appeals; (3) intentional misrepresentation; and (4) breach of the implied duty of good faith and fair dealing, for "adopting and acquiescing" in Inspector Fitzgerald's conduct.  Plaintiff admits that it is no longer pursuing a claim for intentional misrepresentation (or fraudulent inducement – which the substance of the claim actually alleged) and, accordingly, the Court rules in favor of Defendant on Count III.  (*See* Pl.'s Mem. of Law in Opp. to Def.'s Mot. in Limine to Preclude Testimony Related to Releases at 1.)

### A.     Count I: Breach of Contract

Pennsylvania law governs this action.  73 Pa. Cons. Stat. Ann. § 514 (2008).  Under Pennsylvania Law, the essential elements for breach of contract are: "the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages."  *Church v. Tentarelli*, – A.2d – , Civ. A. No. 07-2728, 2008 WL 2579676, at *4 (Pa. Super. 2008) (*citing Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 580 (Pa. Super. 2003), *appeal denied* 852 A.2d 313 (2004)).

#### 1.     *The Releases Signed by Plaintiff Were Valid and Barred Plaintiff's Claims Against the Navy*

The gist of Plaintiff's breach of contract claim is that Whiting-Turner is responsible for the damages Plaintiff allegedly incurred as a result of Fitzgerald's misconduct and Plaintiff's costs in pursuing its case against the Navy because, in Mr. Hantman's own words, Whiting-Turner "pulled

the rug out from under me in terms of the agreed sponsorship."[6]  (Tr. at 136.)  Plaintiff's argument

fails because Plaintiff executed valid releases, which prohibited any claim against the Navy, and

therefore he has not suffered "resultant damages" which could support a claim against Whiting-

Turner.  Plaintiff's argument also fails because Plaintiff, and not Defendant, withdrew its claim from

the Board of Contract Appeals, and because, independent of the releases, Plaintiff has not proven

its damages by a preponderance of the evidence.

> a.      The Releases Prohibited Plaintiff's Underlying Claims Against the Navy

Under Pennsylvania law, a release is a contract.  *G.R. Sponaugle & Sons v. Hunt Const. Grp.*,

366 F. Supp. 2d 236, 242 (M.D. Pa. 2004).  As such "the effect of a release is to be determined by

the ordinary meaning of its language."  *Republic Ins. Co. v. Davis Sys. of Pittsburgh S., Inc.*, 670

A.2d 614, 615 (Pa. 1995).  Accordingly, if the terms of the release are clear and unambiguous, the

court should look no further than the release for interpretation, even if the language is broad and

general, and even if the release was improvidently entered into.  *G.R. Sponaugle & Sons*, 366 F.

Supp. 2d at 242 (*citing Republic Ins. Co.*, 670 A.2d at 615); *see also Taylor v. Solberg*, 778 A.2d

664, 667 (Pa. 2001).

Pennsylvania courts have long recognized the validity of contractual releases as means to

settle accounts, *see Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 896 (3d Cir. 1975),

even where such claims which have not yet accrued. *Camiolo v. State Farm Fire & Cas. Co.*, 334

---

[6] Recognizing Plaintiff's theory of the case, and putting aside Plaintiff's subsequent claims for breach of the implied duty of good faith and fair dealing, it is not entirely clear to the Court which express provision of the Subcontract Plaintiff alleges Defendant has breached. Plaintiff does not cite a specific provision in its Complaint or subsequent briefing.  Indeed, in addition to the fatal deficiencies discussed below, Plaintiff's failure to point to a specific provision in the contract which has been breached sounds the knell for this claim.

F.3d 345, 360 (3d Cir. 2003), *see also Erie Ins. Co. v. Celina Mut. Ins. Co.*, Civ. A. No. 91-6831, 1991 WL 146953, at *4 (E.D. Pa. July 24, 1991) ("Courts applying Pennsylvania law have not hesitated to give effect to the unqualified language of a general release."), *aff'd*, 961 F.2d 208 (3d Cir. 1992).

The terms of the releases executed between Plaintiff and Defendant are unequivocal and unequivocally apply to Plaintiff's claims against the Navy.  As discussed above, the Subcontract made explicit that, in return for payments, Plaintiff would have to sign releases, and the terms of the releases were made part of the Subcontract.  The Partial Releases made clear that Plaintiff released the Navy from "all claims . . . in any manner arising out of work . . . through the period covered by the current invoice and all previous invoices."  The Partial Release also required Plaintiff to affirm that it was "aware of no claims or circumstances that could give rise to any future claims against" the Navy.  In fact, the Partial Releases provided a space for Plaintiff to enumerate any "claims or circumstances" that would give rise to an action against the Navy.  Despite the fact that Plaintiff was aware of and apparently subject to erratic behavior on the part of Fitzgerald as early as December 2003, he never included any mention of such events when he signed the Partial Release Forms.  (*See*, *e.g.*, Def.'s Exs. 11 (March 31, 2004 Executed Partial Release) & 12 (May 31, 2004 Executed Partial Release).  Nor did Plaintiff make a "claim for additional compensation," which he was required to do "no later than seven (7) days following the occurrence" of the events surrounding Fitzgerald's conduct.[7]

The Final Release, which was also required by and included in the Subcontract, required

---

[7] Plaintiff *did* submit a claim for additional compensation for materials.  That claim was granted and Plaintiff was given an additional $3,600.  (Def.'s Ex. 14.)

Plaintiff to "save harmless . . . the Owner [the Navy] . . . from all causes of action . . . from the beginning of the world to the date of this Release, in any manner relating to or arising in connection with the above referenced contract or project." Plaintiff also signed the Final Release and received final payment.

All of the events giving rise to Plaintiff's claim against the Navy occurred prior to Plaintiff's signing of the Final Release (and, in turn, prior to multiple signed Partial Releases). Plaintiff had ample opportunity to bring a claim for additional compensation based on Fitzgerald's behavior prior to signing these releases. He did not. The releases signed by Plaintiff were clear and unequivocal and their language clearly contemplated situations such as Inspector Fitzgerald's interference. Accordingly, Plaintiff's claim against the Navy in the underlying action was barred, and his claim against Whiting-Turner, which is premised on his success against the Navy, is concomitantly barred. *See, e.g., Scandale Assoc. Builders & Eng'rs, Ltd. v. Bell Justice Facilities Corp.*, Civ. A. No. 03-1773, 2007 WL 1074108 (M.D. Pa. Apr. 4, 2007) (unambiguous release barred delay damages).

### b. *The Releases Were Valid and Enforceable*

Plaintiff attempts to make three arguments that the releases were not valid. First, the releases lacked consideration. Second, argues Plaintiff, at the time Plaintiff signed the Final Release, both he and Charles Cinamella both understood that the Final Release did not bar a future claim against the Navy; therefore, the parties engaged in a mutual mistake which forecloses the operation of the Final Release. Finally, Plaintiff argues that Defendant waived the release provisions by forwarding Plaintiff's claims to the Department of Navy. All of these arguments fail. The Court will discuss them *in seriatim*.

*i.      Consideration*

First, Plaintiff argues that there was no consideration for the releases because, under Pennsylvania law, payment which one is already obligated to pay cannot amount to consideration. *See Chatham Communications, Inc. v. General Press Corp.*, 344 A.2d 837, 840 (Pa. 1975).

Plaintiff agreed to submit the releases in the future as a condition of the original Subcontract and therefore it is supported by the same consideration as that contract.  The subcontract provides first that "Subcontractor agrees to execute such specific releases and/or waiver of liens and lien rights as may be requested by the contractor."  (Subcontract Article 8(b).) The subcontract incorporates its "Supplemental Conditions" as part of the "Contract Documents." (Subcontract Article 1(a) & Article 11.)  The Supplemental Conditions include the Partial and Final Release Forms and explicitly state that these forms are, respectively, "to be completed each month and submitted to Whiting-Turner prior to the release of the trade contractors'" monthly and final payments.  (Supplemental Conditions II, IV & V).  Furthermore, signing the Final Release was a prerequisite to finalizing the project.  (Supplemental Conditions III.)  The releases were among the promises Plaintiff made upon entering into the contract.  The consideration for the releases is the same as the consideration for Subcontract.  Accordingly, no additional or independent consideration is necessary because the parties were careful to include the releases as a term of the contract.  *See, e.g.*, *Sabatoro Const. Co. v. Formosa Plastics Corp.*, Civ. A. No. 92-08-30, 1996 WL 453460, at *3 (Del. Super. June 10, 1996) ("The release was clearly part of the contract and consideration existed in that contract."); *Gerald C. Wallace Co. v. Simpson Land Co.*, 281 A.2d 881 (Md. Ct. App. 1973).

Furthermore, even if the releases were considered separate and apart from the Subcontract, under Pennsylvania law "A written release or promise, hereinafter made and signed by the person

releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement that, *in any form of language*, that the signer intends to be legally bound." 33 PA. CONS. STAT. ANN. § 6 (2008) (emphasis added).  The releases clearly show an intent to be legally bound.  All releases were signed before a notary and included the statement "I hereby certify, under penalty of perjury, that the information and representations set forth above are true and accurate to the best of my knowledge, information and belief."  Clearly Plaintiff intended to be legally bound by the releases.  Accordingly, the releases do not fail for lack of consideration.

### ii.    *Mutual Mistake*

Plaintiff next alleges that a mutual mistake occurred upon execution of the Final Release because both Mr. Hantman and Mr. Cinamella believed that Plaintiff would not be precluded from pursuing claims arising from Fitzgerald's conduct.  A mutual mistake occurs when "both parties to a contract are mistaken as to existing facts at the time of execution."  *Ford Motor Co. v. Buseman*, – A.2d –, 2008 WL 2637181, at *6 (Pa. Super. 2008) (internal citations omitted); *see also Travelers Indem. Co. v. Ballantine*, 436 F. Supp. 2d 707, 711 (M.D. Pa. 2006) (applying Pennsylvania law).

First and foremost, the evidence in the record does not indicate a mutual mistake; if any mistake was made, that mistake was unilateral.  Plaintiff testified that, at the time of signing the release, he did not want to give up his rights to bring a claim against the Navy.  (Tr. at 33.)  The evidence shows that Mr. Cinamella, who was not called to the stand, refused to sign an affidavit affirming Plaintiff's understanding.

More importantly, however, the Court will not allow Plaintiff to allege "mutual

misunderstanding" – or even a unilateral mistake – of a fundamental term of the contract, where that fundamental term could not have been clearer.  There was no "mistake of an existing fact."  Plaintiff simply wishes to use his alleged understanding of the contract to rewrite an undesirable term. Where, as here, Plaintiff's "understanding" stands in direct contradiction of an unequivocal term, it cannot be said that a mutual mistake existed.  *See ILM Sys., Inc. v. Suffolk Constr. Co.*, 252 F. Supp. 2d 151, 159 (E.D. Pa. 2002) ("[A] party cannot evade the clear language of the release by contending that he did not subjectively intend to release the claim at issue."); *see also Camiolo*, 334 F.3d at 361 (*quoting Three Rivers Motor Co.*, 522 F.2d at 896 ("In interpreting a release, a court must be mindful that Pennsylvania's 'general rule . . . is that the intention of the parties must govern, but this intention must be gathered from the language of the release.'").

### iii.    Waiver

Plaintiff next argues that the Defendant waived its right to rely on the releases when it presented the claim to the Navy and authorized Plaintiff as its representative to the Board of Contract Appeals.  Although contractual provisions may be waived, *see Black Top Paving Co v. Commonwealth of Pa. Dep't of Transportation*, 466 A.2d 774, 776 (Pa. 1983), a party claiming waiver must show "clear, unequivocal, and decisive action by a party with knowledge of such rights and evident purpose to surrender them."  *Paramount Aviation Corp. v. Augusta*, 178 F.3d 132, 148 (3d Cir 1999).  Waiver by implication requires "undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary."

The releases signed by Plaintiff have not been waived.  When Plaintiff requested that Defendant forward its claim to the Department of Navy he wrote,

> [w]e agree that Whiting-Turner will, as the prime contractor, 'sponsor' the claim but will take no position on its merits. Whiting-Turner will forward the claim but does not have to endorse the claim. In essence, you forward the claim without comments and step aside. It is clear to the Navy that the action is not instigated by Whiting-Turner but merely passed through via the formal "sponsor" process.

Furthermore, the Subcontract states: "Presentation of the claim by Contractor shall not be construed as an acknowledgment of the validity thereof *or a waiver of any right of the Contractor*." (Subcontract Article 6(e) (emphasis added).)  Again, the language could not be clearer.  There is simply no evidence that Defendant waived its rights to enforce the releases against Plaintiff.

       2.    *Plaintiff, and not Defendant, Withdrew Plaintiff's Claims from the Board of Contract Appeals*

In addition to the releases acting as a bar to Plaintiff's breach of contract claim, Plaintiff's claim also fails because it is based on Defendant's "unilateral" withdrawal of its sponsorship; the evidence presented at trial made clear that Plaintiff, and not Defendant, withdrew its own claims. (*See* Compl. ¶ 12; *see also supra* at 10.)  Accordingly, in addition to the above, the facts of this case do not support Plaintiff's breach of contract claim.

       3.    *Plaintiff has not proven damages*

Even assuming that the releases did not bar Plaintiff's claim and that Defendant withdrew Plaintiff's claim from the Board of Contract Appeals, Plaintiff has not proven his damages by a preponderance of the evidence, and thus his contract claim fails for an additional reason.  Plaintiff is claiming $144,502.05 in damages, which includes not only the alleged delays to the project associated with Inspector Fitzgerald, but also includes "attorneys' fees" for Mr. Hantman's *pro se* representation of himself before the Naval Board of Contract Appeals and for time he spent assisting his attorney at the current trial.

Plaintiff did not keep a diary or logs of when Inspector Fitzgerald interfered with his workers or the amount of time delay that any such interference caused.  The three letters sent to Whiting-Turner represent the entirety of the documentation of Fitzgerald's actions.  Yet Plaintiff now claims that its crew time on the project more than doubled by Fitzgerald's interference (Tr. at 102-103), and his supervisory time nearly tripled as a result of Fitzgerald's interference (Tr. at 106-107.)

Plaintiff admits that he is attributing *all* the extra time spent on the project over the original time anticipated in the bid to Fitzgerald's misconduct.  When asked by the Court why all of the excess hours could be attributed to Mr. Fitzgerald's conduct, Mr. Hantman responded: "Because our crews are very uniform in their efficiency and how they perform their jobs."  (Tr. at 132.)  This is insufficient to establish damages.  Furthermore, Plaintiff testified at trial that not all of the extra time spent was attributable to Fitzgerald:

> Q: [Y]ou testified about a problem with the wall design, is that correct?
>
> A: Yes.
>
> Q: Mr. Fitzgerald wasn't responsible for the wall design, was he?
>
> . . .
>
> A. I know that he did not design the wall.
>
> Q: But [Defense Exhibit 6] refers to the problem of substitution of parts in the wall, is that correct?
>
> A: Right.
>
> Q: And . . you're stating here that you spent $14,900 in extra man hours because of this part difference.?
>
> A: Well, no.  I'm sorry, yes.  It does say that, yes. . . .
>
> Q: And is this time included in . . . your claim?
>
> A: I believe that any time that was a result of this is included.  Now, whether this is

18

a correct calculation on this sheet or not, I don't know.

Q: Well, you prepared this sheet, correct?

A: I did prepare it.  Its subject to error.

(Tr. at 109-110.)[8]  Furthermore, Mr. Hantman wrote two letters to Defendant explaining the causes

for delays on the project.  Aside from a passing comment that Plaintiff was experiencing "some

adversity" Plaintiff does not attribute *any* of the delay to Fitzgerald.[9]

Finally, with regard to the "attorneys' fees" that Plaintiff is claiming for the work he did

associated with the underlying litigation or the time spent assisting his attorney in this Court,

Plaintiff cites no provision in the Subcontract or principle at law that would entitle him to fees of this

nature.

### B.       Counts II and IV: Breach of Implied Duty of Good Faith and Fair Dealing

Plaintiff brings two claims for breach of the implied duty of good faith and fair dealing;

Count II for withdrawing Plaintiff's claim from the Board of Navy Appeals and Count IV for

"adopting and acquiescing" in Fitzgerald's conduct.

---

[8] In an attempt to rehabilitate this testimony, on redirect, Mr. Hantman testified that
Whiting-Turner somehow sanctioned the design defects in the wall and, accordingly, those are
appropriate to include in damages.  (Tr. at 127.)
   Plaintiff has not brought a claim against Whiting-Turner based on their liability for
sanctioning design defects during the Project, or anything even remotely resembling that
behavior.  The Court will not allow Plaintiff to amend his Complaint mid-trial to attribute any
such alleged conduct to Defendant.

[9] Plaintiff's method of calculating damages is consistent with the "Total Cost Method,"
which measures damages by subtracting a party's actual costs from its estimated costs (in this
case the costs estimated by Plaintiff in his bid).  The total cost method "is imprecise . . . fraught
with danger." *John F. Harkins Co., Inc. v. Sch. Dist. of Phila.*, 460 A.2d 260, 263 (Pa Super.
1983).  Plaintiff has not shown that all of its actual costs, over the amount estimated in its bid for
the project, were caused by Fitzgerald's conduct.  Therefore, to utilize the Total Cost Method in
this instance would be inappropriate.

As a preliminary matter, "Pennsylvania law does not recognize a separate claim for breach of implied covenant of good faith and fair dealing." *Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc.*, 246 F. Supp. 2d 394, 400 (E.D. Pa. 2000) (internal citations omitted); *see also LSI Title Agency, Inc. v. Evaluation Services Inc.*, 951 A.2d 384, 391 (Pa. Super. 2008) (*citing JHE, Inc. v. Southeastern Pa. Trans. Auth.*, 2002 WL 1018941, at *6 (Pa. Com. Pl. May 17, 2002).

However, even if this Court were to recognize Plaintiff's claim as a breach of contract action, Plaintiff has not proven the facts underlying any such claim. As discussed above, Plaintiff and not Defendant initiated the withdrawal of its claims from the Board of Contract Appeals and, therefore, Defendant cannot be said to have breached any duty to Plaintiff in that respect. Furthermore, there has been not a scintilla of credible evidence that Defendant in any way "adopted or acquiesced" in Fitzgerald's conduct. Accordingly, judgment is entered on behalf of Defendant and against Plaintiff on these counts.

## C.        Defendant's Counterclaim for Breach of Contract

Defendant has raised a counterclaim for breach of contract to recover the attorneys' fees and costs spent on the present litigation. Defendant relies on the language of the Final Release which states that Plaintiff "generally releases and agrees to indemnify and save harmless, The Whiting-Turner Contracting Company . . . from all causes of action [or] suits . . . [and is entitled to] awards and expenses, including attorneys' fees, in law, equity or otherwise."

Although the Final Release contemplates that it will cover an extraordinarily large period of time – "from the beginning of the world through the date of this Release" – it does not cover the time period for which Plaintiff raises his claims. As discussed above, with the exception of Plaintiff's unfounded and passing allegation that Whiting-Turner "adopted or acquiesced in" Inspector

Fitzgerald's conduct, Plaintiff's claims against Whiting-Turner arise from those acts taken with respect to Plaintiff's submission of its claim to the Navy and the Contract Board of Appeals. This time period is not covered under the Final Release and, therefore, Defendant is not entitled to recover attorneys' fees and costs. Accordingly, Judgment will be entered in favor of Plaintiff and against Defendant on Defendant's Counterclaim.

**III. CONCLUSION**

For the reasons discussed above, judgement as to all of Plaintiff's claims will be entered in favor of Defendant, and judgment as to Defendant's counterclaim will be entered in favor of Plaintiff. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KENNETH HANTMAN, INC.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE WHITING-TURNER** | : | |
| **CONTRACTING COMPANY,** | : | **No. 07-1574** |
| **Defendant.** | : | |

## ORDER

**AND NOW**, this **2nd** day of **September**, **2008**, upon consideration of Plaintiff's Proposed Findings of Fact and Supplemental Proposed Findings of Fact, Defendant's Proposed Findings of Fact and Supplemental Proposed Findings of Fact, following a bench trial on the merits, and for the foregoing reasons, it is hereby **ORDERED** that:

1.  Judgment is entered in favor of Defendant The Whiting-Turner Contracting Company and against Plaintiff Kenneth Hantman, Inc. as to all of Plaintiff's claims.

2.  Judgment is entered in favor of Plaintiff Kenneth Hantman, Inc. as to Defendant's Counterclaim.

3.  Defendant's Motion in Limine to Preclude Plaintiff from Submitting Evidence of its Total Cost Damages (Document No. 31)  is **DENIED as moot**.

4.      Defendant's Motion in Limine to Preclude Testimony Related to Releases and Barred by the Parole Evidence Rule (Document No. 32) is **DENIED as moot**.[10]


BY THE COURT:

_____

**Berle M. Schiller, J.**

---

[10] The Court has not allowed any parol evidence to vary the terms of the parties' unambiguous written contract.  *See Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 994 (3d Cir. 1987) ("[T]he parole evidence rule . . . provides that when parties to a contract have reduced their agreement to writing, that writing will be the sole evidence of the agreement, and parole evidence may not be admitted to vary the terms of the contract.")